Brady v. Van Vlaanderen, 2017 NCBC 60.

STATE OF NORTH CAROLINA

COUNTY OF CUMBERLAND

PATRICIA M. BRADY,

Plaintiff,

v.

BRYANT C. VAN VLAANDEREN;
RENEE M. VAN VLAANDEREN;
MARC S. TOWNSEND; LINDA M.
TOWNSEND; UNITED TOOL &
STAMPING COMPANY OF NORTH
CAROLINA, INC.; UNITED REALTY
OF NORTH CAROLINA, LLC;
ENTERPRISE REALTY, LLC; and
WATERS EDGE TOWN
APARTMENTS, LLC,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
12 CVS 7552

**ORDER & OPINION ON MOTIONS
FOR SUMMARY JUDGMENT**

1.     THIS MATTER is before the Court on Plaintiff's Motion for Summary Judgment on *Meislman* [sic] Claim for Dissolution of Corporation and Other Related *Meislman* [sic] Claims Pursuant to Rule 56 of the NC Rules of Civil Procedure ("Plaintiff's Motion") and Defendants Bryant C. Van Vlaanderen, Renee M. Van Vlaanderen[,] Marc S. Townsend[,] United Tool & Stamping Company of North Carolina, Inc.[,] United Realty of North Carolina, LLC, and Waters Edge Town Apartments, LLC's Motion for Summary Judgment ("Defendants' Motion") (collectively the "Motions").

2.     For the reasons stated below, the Court DENIES Plaintiff's Motion and GRANTS Defendants' Motion.

*Bain & McRae, LLP, by Edgar R. Bain, for Plaintiff.*

*Shanahan Law Group, PLLC, by Kieran J. Shanahan, Brandon S. Neuman, John E. Branch III, and Jeffrey M. Kelly, for Defendants.*

Gale, Chief Judge.

## I.    MATTER BEFORE THE COURT

3.    Plaintiff Patricia Brady ("Brady") brought this action to enforce her shareholder and member inspection rights and to judicially dissolve the Defendant corporations based on her alleged frustrated rights as a minority shareholder.  The parties have each filed motions for summary judgment on Brady's *Meiselman* claims.  For the reasons discussed below, the Court concludes that there are contested material facts as to whether Brady has expectations necessary to support a claim for judicial dissolution, but that, even assuming proof of such expectations, based on all the facts and circumstances in this case, judicial dissolution is not an appropriate equitable remedy.  Accordingly, summary judgment is GRANTED in favor of Defendants and against Plaintiff on her *Meiselman* claims.  The Court separately determines that any remaining claim for inspection of records should be dismissed as MOOT.

## II.    THE PARTIES

4.    Brady is one of Anthony Moschella's ("Moschella") daughters.  Moschella formed Defendant United Tool & Stamping Company of North Carolina, Inc. ("United Tool").  Brady was previously employed by United Tool and claims that she was terminated in derogation of her reasonable expectations of continued employment with corresponding salary and benefits.  Brady owns a one-third interest in United

Tool, as well as in Defendant United Realty of North Carolina, LLC ("United Realty") and Defendant Enterprise Realty, LLC ("Enterprise"). At the time this litigation began, she also owned a one-third interest in Defendant Waters Edge Town Apartments, LLC ("Waters Edge"), which was sold during the pendency of this litigation. (Brady Dep. vol. 2, 354:1–3.) Brady was paid $80,000 from that sale for her one-third share. (Brady Dep. vol. 2, 354:4–7.)

5.     Bryant C. Van Vlaanderen ("Bryant") is the husband of Moschella's daughter Renee M. Van Vlaanderen ("Renee"). Bryant has co-managed United Tool since he was hired as Vice President of Administration on June 1, 1996. (B. Van Vlaanderen Aff. ¶ 7.) Marc S. Townsend ("Marc") is the husband of Moschella's daughter Linda M. Townsend ("Linda"). Marc has co-managed United Tool with Bryant since he was hired as the Vice President of Operations on June 1, 1996. (B. Van Vlaanderen Aff. ¶ 7.) Both Renee and Linda have worked for United Tool as administrative employees since March 12, 2007. (B. Van Vlaanderen Aff. ¶ 14.) Collectively, Bryant, Renee, Marc, and Linda (the "Individual Defendants") own the remaining two-thirds interest in United Tool, United Realty, and Enterprise.

6.     United Tool is a North Carolina corporation that manufactures metal stampings and provides tooling and engineering services. United Realty is a North Carolina limited liability company that owns real estate, which it leases to United Tool. (*See* B. Van Vlaanderen Dep. 27:11–12, 31:16–32:6.)

7.     Enterprise is a North Carolina limited liability company engaged in the purchase, sale, and rental of real estate. (M. Townsend Dep. 67:5–8.) All claims

against Enterprise have been dismissed. *See Brady v. Van Vlaanderen*, No. 12-CVS-7552, 2016 NCBC LEXIS 56, at \*20 (N.C. Super. Ct. July 21, 2016). Waters Edge has been sold. (Brady Dep. vol. 2, 354:1–3.)

## III.    FACTUAL BACKGROUND

### A.    The Parties' Employment with United Tool during Moschella's Ownership

8.    United Tool was formed as a North Carolina corporation on June 1, 1996, after Moschella and his business partner split the stock of their New Jersey corporation. (B. Van Vlaanderen Aff. ¶¶ 4, 7.) At that time, Moschella was United Tool's sole owner and president. (B. Van Vlaanderen Dep. 76:18–19; B. Van Vlaanderen Aff. ¶ 8.) On December 9, 1996, Moschella gave twenty-five shares of United Tool's nonvoting common stock to three of his daughters and their spouses but retained 100% of the voting stock. (B. Van Vlaanderen Aff. ¶ 10.) As nonvoting shareholders, the family members received dividends. (B. Van Vlaanderen Aff. ¶ 10.)

9.    Bryant and Marc worked for the New Jersey corporation prior to the stock split and were employed by United Tool at its inception before they became shareholders. Bryant and Marc testify that their employment was independent of their ownership status. (B. Van Vlaanderen Aff. ¶ 11; M. Townsend Dep. 77:24–78:15.) Bryant and Marc have been United Tool's co-managers responsible for managing the day-to-day operations since United Tool was formed. (B. Van Vlaanderen Aff. ¶ 8.) Moschella was never employed by United Tool and did not receive a salary or employee benefits. (B. Van Vlaanderen Aff. ¶ 8.)

10. Brady's first husband, Richard Keller, worked for United Tool from its inception until he was fired in January 2002, and he was paid the same salary as Marc and Bryant. (B. Van Vlaanderen Dep. 92:24–93:1; *see also* Brady Dep. vol. 2, 329:24–330:3.)

11. Moschella hired Brady as a United Tool office assistant on September 2, 2001, over five years after she had become a shareholder. (B. Van Vlaanderen Aff. ¶ 12.) Brady received a salary of $400 per week and became eligible for medical insurance on December 1, 2001. (B. Van Vlaanderen Aff. ¶ 12.) Brady contends that she was not expected to work in exchange for her salary and benefits because she was only hired to ensure that she had a stream of income after she divorced Richard Keller.

12. Brady divorced Richard Keller in November 2001. (Brady Dep. vol. 2, 330:13–17.) Brady contends that, after Richard Keller was terminated around January 2002, her compensation was increased to the same amount as Marc's and Bryant's salaries. (Brady Dep. vol. 2, 198:2–14.)

13. Brady stopped going to work around May 2005. (B. Van Vlaanderen Aff. ¶ 12.) Brady testifies that Bryant continually told her not to come to work. (Brady Dep. vol. 1, 78:10–13, 80:6–8; Brady Dep. vol. 2, 198:13–17.) On May 31, 2005, Moschella terminated Brady's employment, as a result of which she stopped receiving a salary, medical insurance, and other employee benefits. (B. Van Vlaanderen Aff. ¶ 12.) Brady remained a United Tool shareholder and continued to receive her pro rata share of United Tool's dividend distributions. (B. Van Vlaanderen Aff. ¶ 13.)

14. The parties disagree as to the reason for Brady's termination in 2005. Brady contends that she stopped going to work because her second husband, Tim Brady, had started working for United Tool so that, consistent with Moschella's desire, Brady and her family would receive income without her having to work. (*See* Brady Dep. vol. 2, 207:4–17, 209:2–12). Brady claims that, starting sometime around 1992, Moschella set up an arrangement for at least one person from Linda's, Renee's, and Brady's families to be a W-2 employee of United Tool. (Brady Dep. vol. 2, 193:9–13, 193:22–194:1, 211:25–212:16.) Under that arrangement, United Tool paid the same salary to each daughter's husband. (Brady Dep. vol. 2, 191:18–24, 193:22–194:1.) Brady admits that the husbands were required to work for their salaries and that Moschella retained the right to terminate them. (Brady Dep. vol. 2, 195:10–16, 196:7–12.) Brady also admits that the purported arrangement did not include two of Moschella's daughters, who never received any form of income from United Tool. (Brady Dep. vol. 2, 162:7–163:3, 163:13–20, 165:19–24.)

15. Defendants deny that Moschella ever implemented such an arrangement. Instead, they contend that all United Tool employees were expected to work for their salaries and that Moschella terminated Brady on May 31, 2005, because she stopped performing her job duties. Brady does not dispute that if she had been willing to report for work, she could have continued her employment with United Tool, but that she chose not to do so. (Brady Dep. vol. 2, 209:13–16.)

16. Brady was not employed by United Tool and did not receive an income or employee benefits from June 1, 2005, through March 12, 2007. (Brady Dep. vol. 2,

208:19–208:22; B. Van Vlaanderen Aff. ¶¶ 12, 14.) During that time, Brady's second husband, Tim Brady, worked for United Tool and was paid $3,000 a week, the same as Marc's and Bryant's salary. (*See* B. Van Vlaanderen Dep. 84:17–22; Brady Dep. vol. 2, 190:2–8.)

17.     On March 12, 2007, Moschella hired Renee, Linda, and Brady to work for United Tool at a salary of $800 a week. (B. Van Vlaanderen Aff. ¶ 14.) Brady was hired to "assist with administrative tasks and assist with United Tool's Information Technology service providers." (B. Van Vlaanderen Aff. ¶ 14.) Brady asserts, and Defendants deny, that she was continually told to stay home and not to come to work. (Brady Dep. vol. 2, 213:11–24.) From 2008 through 2011, Brady seldom worked but was compensated as a United Tool employee. Bryant indicated that he did not talk to Brady about her absences because he believed that "[i]t was her father's responsibility to direct [Brady] and to make decision[s] on [her] employment in the company." (B. Van Vlaanderen Dep. 99:4–6.) Defendants contend that Moschella said he would fire Brady if she did not start attending work. (R. Van Vlaanderen Dep. 103:21–22.) Brady contends that the Individual Defendants and Moschella knew that Brady rarely worked and did not complain because she was not expected to work for her salary.

**B.     Events after Moschella Divested Ownership of United Tool**

18.     On January 2, 2012, United Tool purchased all of Moschella's stock. (B. Van Vlaanderen Aff. ¶¶ 18–19.) At that time, United Tool's articles of incorporation

were amended to convert Brady's and the Individual Defendants' nonvoting stock to voting stock. (B. Van Vlaanderen Aff. ¶ 18.)

19. On January 16, 2012, Brady and the Individual Defendants held a shareholder meeting where they voted to affirm Bryant as president of United Tool's board of directors and to elect Renee as treasurer and Marc as secretary. (B. Van Vlaanderen Dep. 66:23–67:3, 67:23–68:2; B. Van Vlaanderen Aff. ¶ 19.) Additionally, all the Individual Defendants voted to terminate Tim Brady's employment with United Tool based on his poor performance and insubordination. (*See* B. Van Vlaanderen Dep. 72:2–18; *see also* M. Townsend Dep. 73:15–18, 103:14–18, 104:15–19.)

20. On that same day, Bryant and Marc, acting as managers, increased Brady's salary from $800 a week to $3,000 a week, even though they knew that Brady had not substantially worked through 2011 and 2012. (*See* B. Van Vlaanderen Dep. 90:19–25, 99:12–16; *see also* M. Townsend Dep. 73:19–25, 113:22–25; L. Townsend Dep. 94:6–8.) Brady contends that they increased her salary based on the "custom" that at least one person in each family make the same amount. (Brady Dep. vol. 2, 268:19–22.) Defendants contend, rather, that they increased Brady's salary to try "to encourage her . . . to start participating and to start adding value to the company." (B. Van Vlaanderen Dep. 101:4–6; *see also* M. Townsend Dep. 116:12–15; L. Townsend Dep. 94:6–8; B. Van Vlaanderen Aff. ¶ 20.) Bryant and Marc contend that they expressed their expectation that Brady "start working with [them]," and that her salary was contingent upon her working. (B. Van Vlaanderen Dep. 103:13–14;

*see also* B. Van Vlaanderen Dep. 103:5–16; M. Townsend Dep. 117:12–17.) Defendants contend that Brady "was specifically informed that her salary was not guaranteed and that [Bryant and Marc], as managers, had the authority to end her employment with United Tool." (B. Van Vlaanderen Aff. ¶ 21.) Brady denies that such conversations took place and instead contends that she was repeatedly told not to come to work and that there was no work for her to do. (Brady Dep. vol. 2, 213:11–22.)

## C.   Termination of Brady's Employment

21.    On May 14, 2012, Brady, through her counsel, requested to review United Tool's financial records and convene a shareholder meeting. (B. Van Vlaanderen Aff. ¶ 26.) A shareholder meeting was then held on May 24, 2012, and attended by the Individual Defendants, Brady, Brady's attorney, and Mel Cohen, United Tool's accountant. (B. Van Vlaanderen Aff. ¶ 26.) Mr. Cohen advised the shareholders that United Tool "could not employ [Brady] unless she served a function of the company and performed a specific duty of some kind." (Cohen Dep. 43:4–6; *see also* B. Van Vlaanderen Aff. ¶ 27.)

22.    That day, Bryant and Marc, acting as managers of United Tool, decided to terminate Brady's employment based on Mr. Cohen's advice and their understanding that Brady did not intend to perform actual work for the company. (B. Van Vlaanderen Aff. ¶ 28.)

23.    Brady disputes the reason for her termination, contending that all the Individual Defendants knew and implicitly agreed that she would receive an

employee salary and benefits without having to work. (Brady Dep. vol. 2, 214:6–15; *see also* Brady Dep. vol. 2, 365:19–20.) Brady contends that she was fired, shut out of company management, and estranged from the family in retaliation for asserting her shareholder rights to inspect corporate books and records and challenging how the companies were being managed. Brady asserts that if she had been asked to come to work, she would have, and that she remains willing to work the same amount as her sisters. (Brady Dep. vol. 2, 215:20–22, 284:9–14.)

24.    Brady's W-2 income and employee benefits ceased on May 24, 2012. (B. Van Vlaanderen Aff. ¶ 28.)

25.    Brady remains a United Tool shareholder. Brady attended all four United Tool shareholder meetings held between January 2, 2012, and April 9, 2015, and participated in all the votes conducted at those meetings. (B. Van Vlaanderen Aff. ¶ 25.) As of April 9, 2015, Brady had received over $1,900,000 in United Tool dividend payments since her termination in 2012. (B. Van Vlaanderen Aff. ¶ 30; *see also* Brady Dep. vol. 2, 166:8–20.)

**D.    United Realty's Operations**

26.    United Realty was formed around 1998 by the Individual Defendants and Brady. At that time, United Realty purchased the land and building that United Tool was located on from Moschella. (B. Van Vlaanderen Dep. 25:20–24, 27:4–15.) United Realty then rented, and continues to rent, the real estate to United Tool. (Brady Dep. vol. 2, 183:18–21.) United Realty does not have any employees. Marc and Linda keep United Realty's records, and the members usually discuss any issues

regarding United Realty at United Tool shareholder meetings. Brady and the Individual Defendants each receive a monthly distribution check, usually in excess of $5,000, from United Realty. (B. Van Vlaanderen Dep. 35:2–7; Pl.'s Suppl. Interrog. Resp. ¶¶ 24, 33; Brady Dep. vol. 1, 44:1–2, 6–8.)

27. Brady contends that the rent United Realty is charging United Tool is too low and "there is a significant amount of land that is not being utilized." (Pl.'s Suppl. Interrog. Resp. ¶ 18.) She proposed ideas for how the land could be used to generate additional income for United Realty, which the other members rejected. (Pl.'s Suppl. Interrog. Resp. ¶ 18.) Brady now contends, and Defendants deny, that United Realty is being mismanaged and its assets are being wasted.

E.    **The Operation and Sale of Waters Edge**

28. Waters Edge was a thirty-unit apartment complex in Fayetteville, North Carolina, purchased by Brady and the Individual Defendants around 2004. (B. Van Vlaanderen Dep. 50:24–25; M. Townsend Dep. 83:14–16.) Marc was the managing agent of Waters Edge. (M. Townsend Dep. 38:4–5.)

29. In 2012, after this action was initiated, Waters Edge was sold. (B. Van Vlaanderen Dep. 53:21–23.) Defendants contend that all the members had a meeting in May 2012 at United Tool where they discussed selling Waters Edge. (B. Van Vlaanderen Dep. 53:24–54:11.) Brady, however, contends that the Individual Defendants decided to sell Waters Edge without informing her. (Pl.'s Suppl. Interrog. Resp. ¶ 19.) But, Brady admits that she authorized the sale. (Pl.'s Suppl. Interrog.

Resp. ¶ 21.)  As a result of the sale, Brady received $80,000 as consideration for her one-third ownership interest.  (Brady Dep. vol. 2, 354:1–7.)

## IV.    PROCEDURAL HISTORY

30.    Brady filed her original Complaint on August 24, 2012.  The case was designated a mandatory complex business case on September 4, 2012, and assigned to the undersigned on September 19, 2012.

31.    On September 27, 2012, Brady filed an Amended Complaint, bringing eight claims against Defendants.  Defendants timely moved to dismiss all of Brady's claims on November 21, 2012.  On July 24, 2013, the Court partially granted the motion, dismissing Brady's claims for an appraisal of United Tool and wrongful termination but allowing Brady to file a further amended complaint as to her remaining claims.  *Brady v. Van Vlaanderen*, No. 12-CVS-7552, 2013 NCBC LEXIS 34, at *14–15 (N.C. Super. Ct. July 24, 2013).

32.    Brady filed a Second Amended Complaint on August 6, 2013, asserting claims for (1) access to information and records of United Tool; (2) inspection of records against United Realty, Enterprise, and Waters Edge; (3) involuntary dissolution of United Tool; (4) liquidation of United Tool; and (5) judicial dissolution of United Realty, Enterprise, and Waters Edge (claims 3 through 5 are collectively referred to as the "*Meiselman* Claims").

33.    At the parties' request, the Court stayed the case from August 26, 2013, until March 15, 2014.  On April 21, 2014, Defendants filed their answer to the Second Amended Complaint, and Enterprise brought counterclaims alleging that Brady

breached Enterprise's operating agreement and breached her fiduciary duties by refusing to make required capital contributions.

34.   Brady moved for summary judgment on her *Meiselman* Claims on February 26, 2015.

35.   On April 9, 2015, Enterprise moved for summary judgment, and the Individual Defendants, United Tool, United Realty, and Waters Edge filed a separate motion for summary judgment.

36.   On June 3, 2015, the Court dismissed Brady's claim against United Realty for inspection of corporate records based on Brady's admission that she has been provided copies of, or given access to, all documents to which she contends that she is entitled.  *See Brady v. Van Vlaanderen,* No. 12-CVS-7552, 2015 NCBC LEXIS 59, at *6–7 (N.C. Super. Ct. June 3, 2015).

37.   The Court first calendared all pending motions for oral argument on August 27, 2015, but the summary judgment hearing was deferred when Brady filed an untimely affidavit and Defendants requested the opportunity to depose the affiant.

38.   On July 21, 2016, the Court granted in part and denied in part Enterprise's motion for summary judgment, resolving all claims and counterclaims between Brady and Enterprise.  *Brady*, 2016 NCBC LEXIS 56, at *20.  Defendants have requested clarification on that order, and the Court will issue a separate order on that issue.

39.   On October 28, 2016, the Court heard oral argument on the remaining Motions.  The Motions are now ripe for disposition.

## V. STANDARD OF REVIEW

40. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting N.C. Gen. Stat. § 1A-1, Rule 56(c)). The movant bears the burden of showing that there is no genuine issue of material fact with respect to the essential elements of a claim and that the movant is entitled to judgment as a matter of law. *See Steel Creek Dev. Corp. v. Smith*, 300 N.C. 631, 637, 268 S.E.2d 205, 209 (1980). A genuine issue is one "supported by substantial evidence," and "[a]n issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action." *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) (alteration in original) (quoting *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518, 186 S.E.2d 897, 901 (1972)).

41. If the movant satisfies its burden, the nonmovant then bears the burden "to present a forecast of evidence which shows that a genuine issue of fact exists." *Watts v. Cumberland Cty. Hosp. Sys., Inc.*, 75 N.C. App. 1, 6, 330 S.E.2d 242, 247 (1985), *rev'd in part on other grounds*, 317 N.C. 321, 345 S.E.2d 201 (1986). The Court must view the evidence in the light most favorable to the nonmovant. *See Coats v.*

*Jones*, 63 N.C. App. 151, 154, 303 S.E.2d 655, 657, *aff'd*, 309 N.C. 815, 309 S.E.2d 253 (1983).

## VI.    ANALYSIS

### A.    <u>Brady Is Not Entitled to the Equitable Remedy of Judicial Dissolution.</u>

42.    N.C. Gen. Stat. § 55-14-30 grants a court the authority to judicially dissolve a corporation when "liquidation is reasonably necessary for the protection of the rights or interests of the complaining shareholder." N.C. Gen. Stat. § 55-14-30(2) (2015). This statute is the basis for what has become known as a *Meiselman* claim— a claim through which a minority shareholder seeks a decree of judicial dissolution.

43.    To secure a decree of judicial dissolution under the second prong of section 55-14-30(2), a plaintiff must demonstrate that

> (1) he had one or more substantial reasonable expectations known or assumed by the other participants; (2) the expectation has been frustrated; (3) the frustration was without fault of plaintiff and was in large part beyond his control; and (4) under all of the circumstances of the case plaintiff is entitled to some form of equitable relief.

*Meiselman v. Meiselman*, 309 N.C. 279, 301, 307 S.E.2d 551, 564 (1983).

44.    Those necessary elements require both that the minority shareholder persuade a trier of fact that she had reasonable expectations that were frustrated and that the Court determine that the circumstances justify the extraordinary equitable remedy of judicial dissolution. Significantly, a statutory *Meiselman* claim does not vest the Court with authority to order equitable remedies other than judicial dissolution.

45.     A shareholder's reasonable expectations must be determined on a case-by-case basis "by examining the entire history of the [shareholders'] relationship," including the expectations "created at the inception of the [shareholders'] relationship; those 'reasonable expectations' as altered over time; and the 'reasonable expectations' which develop[ed] as the [shareholders] engage[d] in a course of dealing in conducting the affairs of the corporation." *Id.* at 298, 307 S.E.2d at 563.

46.     Assuming those facts are found in favor of the minority shareholder seeking dissolution, "the trial court must 'exercise its equitable discretion, and consider the actual benefit and injury to [all of] the shareholders resulting from dissolution.'" *Foster v. Foster Farms, Inc.*, 112 N.C. App. 700, 711, 436 S.E.2d 843, 850 (1993) (alteration in original) (quoting *Meiselman*, 309 N.C. at 297, 307 S.E.2d at 562). A court is not required to judicially dissolve a corporation, even if the shareholder establishes that judicial dissolution is proper pursuant to section 55-14-30(2). *Id.* at 706, 436 S.E.2d at 847.

**(1)     There are material contested facts as to whether Brady had a reasonable expectation that has been frustrated through no fault of her own.**

47.     Brady seeks to enforce two expectations: (1) continued employment by United Tool, with accompanying benefits, including health insurance, a 401(k) retirement plan, and other fringe benefits; and (2) a meaningful role in the management of United Tool.

48. Brady's expectation of continued employment arises from her claim that Moschella established a policy that one member of Brady's, Renee's, and Linda's families would be employed by United Tool and receive a salary of $3,000 a week. (*See* Brady Dep. vol. 2, 268:21–22.) Brady contends that this policy did not require her "to do any actual work," but instead, the "purpose of her employment was" to provide "a continued stream of income for her family while she did little or no work." (Mem. Supp. Pl.'s Mot. Summ. J. 14.) Brady contends that this purported policy applied only to herself, Renee, and Linda, and not to Moschella's other two daughters, who never received any form of income from United Tool. (Brady Dep. vol. 2, 162:5–163:3, 163:13–20, 165:19–24.)

49. Defendants deny that any family member was entitled to compensation without actually working. The record shows that Brady was the only person who received employee compensation while not coming to work. Each of Brady's husbands were paid a salary of $3,000 a week, which is the same salary paid to Bryant and Marc, but they were actually working for United Tool when they were being paid. (B. Van Vlaanderen Dep. 84:17–85:12; *see also* M. Townsend Dep. 77:8–12.) After Tim Brady was terminated, Brady's salary was increased to $3,000 a week. (B. Van Vlaanderen Dep. 89:8–12, 90:9–13; M. Townsend Dep. 112:22–25, 113:3–5.) Brady contends that Bryant and Marc raised her salary because it was necessary to maintain the compensation arrangement created by Moschella. (Brady Dep. vol. 2, 268:19–22.) Marc and Bryant admit that United Tool raised Brady's salary, even when they knew she was not coming to work, but contend that they did so to entice

Brady to come back to work, not because of any family arrangement. (B. Van Vlaanderen Dep. 104:4–10; B. Van Vlaanderen Aff. ¶ 20.)

50. The Individual Defendants all deny that such an agreement was ever created. In fact, Defendants contend that the facts are inconsistent with such an agreement because there "was a substantial period of time" during which "salaries were not paid equally." (B. Van Vlaanderen Dep. 136:21–23.) The Individual Defendants do not share Brady's belief that each family member was guaranteed equal payment in the form of employee compensation, but rather understood that "[their] employment could be terminated if [they] failed to perform work for United Tool," regardless of their status as shareholders or the family relationship. (B. Van Vlaanderen Aff. ¶ 22; *see also* M. Townsend Dep. 78:14–15 (explaining that he "never had a reasonable expectation of employment at United Tool[,] whether [he] was a shareholder or not").) None of the Individual Defendants ever received a salary without actually performing work for United Tool.

51. Defendants further argue that Brady's expectation is belied by the fact that Moschella had previously fired her for not coming to work. (*See* B. Van Vlaanderen Aff. ¶ 12.) Brady, however, counters that she was not terminated but simply had stopped going to work, because Tim Brady had started working for United Tool and was being paid a $3,000 weekly salary. (Brady Dep. vol. 2, 207:4–17.)

52. Brady denies ever being told that her employment was contingent upon her coming to work. Brady contends, in any event, that she would have worked for her salary if the Individual Defendants had allowed her to do so, (Brady Dep. vol. 2,

215:20–22,) but that Bryant told her numerous times not to come to work because there was nothing for her to do, (Brady Dep. vol. 2, 213:11–22.) Additionally, Brady testified that Linda and Renee told her she should travel to the beach or move to Paris. (Brady Dep. vol. 2, 213:14–16.) Based on those comments, Brady believed, and still believes, that there was an expectation that she would be paid as an employee without coming to work.

53. The Court determines that there are material contested facts regarding, first, whether Brady had a reasonable expectation of continued employment, and second, whether she bears the responsibility for that expectation not having been met. Accordingly, neither party is entitled to summary judgment on this aspect of Brady's *Meiselman* claim against United Tool.

54. As to Brady's second claimed reasonable expectation, the uncontested facts demonstrate that Brady's right as a minority shareholder to participate in United Tool's management has not been unreasonably frustrated. Brady was never a manager of United Tool. (B. Van Vlaanderen Aff. ¶ 12.) When Brady was employed by United Tool, she was an administrator and an IT assistant. (B. Van Vlaanderen Aff. ¶¶ 12, 14.) As a shareholder, she had, and continues to have, a right to vote at board meetings. Even after Brady's employment was terminated, she remained a shareholder of United Tool, and she has participated in shareholder meetings and received dividend payments in excess of $1,900,000. (B. Van Vlaanderen Aff. ¶¶ 25, 30; *see also* Brady Dep. vol. 2, 166:8–20.) Admittedly, she is frustrated that

she holds only a minority interest, but she has enjoyed all rights attendant to her minority ownership.

55.     To the extent that Brady's *Meiselman* claim against United Tool is based on her purported exclusion from management, Defendants are entitled to summary judgment in their favor and against Plaintiff.

**(2)     <u>Equitable considerations militate against a decree of judicial dissolution.</u>**

56.     Even if Brady establishes that she had reasonable expectations that were known to the other shareholders and have been frustrated through no fault of her own, it does not automatically follow that she is entitled to a decree of judicial dissolution.  Dissolution is an equitable remedy; therefore, before granting such a remedy, the Court "must exercise its equitable discretion, and consider the actual benefit and injury to [all of] the shareholders resulting from dissolution." *Meiselman*, 309 N.C. at 297, 307 S.E.2d at 562 (alteration in original) (quoting *Henry George & Sons, Inc. v. Cooper-George, Inc.*, 632 P.2d 512, 516 (Wash. 1981)).  A minority shareholder is not entitled to "dissolution of a corporation . . . at the expense of the corporation and without regard to the rights and interests of the other shareholders." *Id.*

57.     Brady has stated on several occasions that, realistically, she is "not trying to get [United Tool] dissolved," but prefers an alternative remedy, such as requiring United Tool to buy out her ownership interest.  (Brady Dep. vol. 2, 179:11; *see* Brady Dep. vol. 2, 179:21–24; Mem. Supp. Pl.'s Mot. Summ. J. 24.)  The Court need not consider whether it might award any alternative equitable remedy, because

it does not have the power to do so. At the time the North Carolina Supreme Court decided *Meiselman*, courts had broad equitable powers to fashion relief for a minority shareholder. *See Meiselman*, 309 N.C. at 300, 307 S.E.2d at 563–64. "A significant difference exists between the statutory framework in which North Carolina courts analyzed *Meiselman* and the framework in existence today." *High Point Bank & Tr. Co. v. Sapona Mfg. Co.*, No. 08-CVS-1065, 2010 NCBC LEXIS 14, at *16 (N.C. Super. Ct. June 22, 2010) (Tennille, J.), *aff'd*, 212 N.C. App. 148, 713 S.E.2d 12 (2011). When *Meiselman* was decided, trial courts had the authority under N.C. Gen. Stat. § 55-125.1 to mandate judicial dissolution, to require the company to buy out the complaining shareholder, or to order alternative forms of equitable relief. *Id.* at *16–17. After *Meiselman*, the legislature narrowed the statute and "eliminated the alternative remedies to dissolution set forth in section 55-125.1." *Id.* at *18; *see also* Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 28.12(2), at 28-25 to -26 (7th ed. 2016).

58. Under the current statute, a buyout is triggered only after the court orders that judicial dissolution is otherwise necessary. Even then, the corporation has the option but not the obligation to buy out the minority shareholder, because the Court cannot mandate a buyout. *High Point Bank & Tr. Co.*, 2010 NCBC LEXIS 14, at *15; *Coleman v. Coleman*, No. 14-CVS-3689, 2015 NCBC LEXIS 114, at *11 (N.C. Super. Ct. Dec. 10, 2015) (Bledsoe, J.); *see also* Robinson, *supra*, § 28.12(2), at 28-25 to -26. If the corporation chooses to exercise the buyout option, the court's role would then be limited to establishing the fair value at which the shares would be purchased.

*See* N.C. Gen. Stat. § 55-14-31(d) (2015); *see also Royals v. Piedmont Elec. Repair Co.*, 137 N.C. App. 700, 709, 529 S.E.2d 515, 521 (2000), *aff'g* No. 97-CVS-720, 1999 NCBC LEXIS 1 (N.C. Super. Ct. Mar. 3, 1999) (Tennille, J.).

59.     "Justifying liquidation as a tool for enforcing the rights or interests of a complaining shareholder . . . requires a strong showing" because "[t]he statutory right to judicial dissolution . . . [is] counter to the judiciary's traditional deference to the majority rule in corporate management and to the business judgment rule." *High Point Bank & Tr. Co.*, 2010 NCBC LEXIS 14, at \*19 (citing *Meiselman*, 309 N.C. at 291–92, 307 S.E.2d at 559).  To determine whether dissolution is equitable, the Court should consider numerous factors, including "the parties' original expectations, the event or action that intervened in these expectations, destruction of original expectations, the status of minority shareholders, the nature of the business, the impact on employees and others, the relationship between the parties, and recent corporate actions." *Joalpe-Industria de Expositores, S.A. v. Alves*, No. 10-CVS-5697, 2015 NCBC LEXIS 11, at \*23 (N.C. Super. Ct. Jan. 27, 2015) (McGuire, J.); *see also Royals*, 1999 NCBC LEXIS 1, at \*23–30.

60.     As an initial matter, there is no basis on this record to dissolve United Tool to preserve assets from further diminution because of ongoing operating losses. The record clearly establishes that United Tool continues profitable operations and that Brady continues to receive substantial dividends as a result.  (Brady Dep. vol. 1, 115:23; Brady Dep. vol. 2, 167:1–5; B. Van Vlaanderen Aff. ¶ 30.)

61.     Admittedly, disputes among the family members have led to unfortunate consequences, but that does not justify the Court's intervention. The Court properly seeks to "avoid mandating adversarial relationships in closely held corporations where the success of the business depends on the good faith, mutual respect, and close cooperation of the participants." *High Point Bank & Tr. Co.*, 2010 NCBC LEXIS 14, at \*20–21. Despite disagreements, United Tool's shareholders have maintained the business and have held shareholder meetings since this lawsuit commenced. (*See* B. Van Vlaanderen Aff. ¶ 25.)

62.     The Court must be particularly mindful of the impact that dissolution would have on innocent third parties, such as employees. *Royals*, 1999 NCBC LEXIS 1, at \*29. This Court considered that particular factor at length in *High Point Bank & Trust Co. v. Sapona Manufacturing Co.* when it found that dissolution was inequitable because it "would severely diminish the value of the other shareholders' ownership interest, and hundreds of employees could potentially lose their jobs." 2010 NCBC LEXIS 14, at \*41. The Court also noted that dissolution could have imposed significant tax liabilities on all shareholders. *Id.*

63.     As of April 7, 2015, United Tool had seventy-two employees. (B. Van Vlaanderen Aff. ¶ 33.) There is no indication that those employees would receive adequate protection from substantial adverse effects in the event of the dissolution of United Tool, which currently provides stable employment because of its ongoing profitable operations.

64. Notwithstanding that some stakeholders may be adversely affected, a court may proceed with dissolution if a business is "being conducted to the unfair advantage of the majority shareholder." *Garlock v. Se. Gas & Power, Inc.*, No. 00-CVS-01018, 2001 NCBC LEXIS 9, at *35 (N.C. Super. Ct. Nov. 14, 2001) (Tennille, J.); *see also Joalpe-Industria de Expositores, S.A.*, 2015 NCBC LEXIS 11, at *25; *Royals*, 1999 NCBC LEXIS 1, at *32. But if the business "can be operated for the benefit of all the shareholders," then dissolution is not necessary. *Royals*, 1999 NCBC LEXIS 1, at *27. The Court now finds, as Judge Tennille did in earlier cases, that the "regular payment of dividends evidences the directors' intent to free profits for distribution rather than holding them captive or paying out excessive salaries," and strongly indicates that the company is being, and can be, operated for the benefit of all shareholders. *High Point Bank & Tr. Co.*, 2010 NCBC LEXIS 14, at *22; *see also Royals*, 1999 NCBC LEXIS 1, at *27.

65. There is no evidence that the Individual Defendants have used their collective majority shareholder position to manipulate shareholder compensation to their advantage or to Brady's disadvantage. None of the other shareholders have received a salary increase, a bonus, or any other similar payout from United Tool since Brady's employment was terminated in May 2012. (B. Van Vlaanderen Aff. ¶¶ 31–32.) The facts now before the Court do not rise to the level of extreme actions by the majority shareholders that preclude Brady from receiving any reasonable return on her investment, which is what compelled Judge Tennille to order dissolution in *Royals v. Piedmont Electric Repair Co.*, 1999 NCBC LEXIS 1, at *31.

66.     Rather, the facts of this case more closely approximate those in *High Point Bank & Trust Co. v. Sapona Manufacturing Co.* that led Judge Tennille to deny the request for judicial dissolution because the complaining minority shareholder was regularly receiving dividend payments and antagonistic relationships did not prevent the successful ongoing operation of the company.  2010 NCBC LEXIS 14, at *23–25.

67.     The Court has carefully considered Brady's contention that "she is stuck in an ownership role . . . without any of the benefits of ownership." (Mem. Supp. Pl.'s Mot. Summ. J. 17.)  That assertion, of course, fails to acknowledge that the millions of dollars in dividends paid during the course of this litigation are a significant benefit of ownership.   Another pertinent fact is that Defendants have not made any effort to preclude Brady from selling her interest in United Tool.  While admittedly, Brady only has a minority interest, she has the largest single ownership percentage of all the shareholders.  There is no shareholder agreement that restricts her ability to sell her interest, and Defendants even reached an agreement with Brady regarding the disclosure of confidential information to any potential purchasers.

68.     In sum, even assuming that Brady had a reasonable expectation of continued employment, that expectation does not justify the equitable remedy of a decree compelling judicial dissolution of United Tool.  Brady is still receiving benefits of her ownership interest in a profitable corporation.  Any loss of employment benefits that Brady may have suffered does not justify the much larger loss that would be suffered by others upon the dissolution of United Tool.  Additionally, Brady has not forecast sufficient evidence to establish that United Tool's assets are being

mismanaged or wasted to warrant liquidation pursuant to the fourth prong of N.C. Gen. Stat. § 55-14-30(2). Accordingly, Defendants are entitled to summary judgment in their favor and against Brady on her claim to dissolve or liquidate United Tool.

**B.** **Brady Is Not Entitled to a Judicial Decree to Dissolve United Realty or Waters Edge.**

69. Dissolution of an LLC is governed by N.C. Gen. Stat. § 57D-6-02(2), which allows a court to dissolve an LLC in a proceeding brought by a member of the LLC "if it is established that (i) it is not practicable to conduct the LLC's business in conformance with the operating agreement and [chapter 57D] or (ii) liquidation of the LLC is necessary to protect the rights and interests of the member." N.C. Gen. Stat. § 57D-6-02(2) (2015).

70. Although there are obvious common policies between this provision and section 55-14-30, the North Carolina appellate courts have not yet addressed whether a claim pursuant to section 57D-6-02(2) is governed by the same principles as a *Meiselman* claim under chapter 55. *See Blythe v. Bell*, No. 11-CVS-933, 2013 NCBC LEXIS 7, at *6 (N.C. Super. Ct. Feb. 4, 2013).

71. Brady contends that Waters Edge and United Realty should be judicially dissolved because they are being mismanaged and the companies' assets are being wasted. Brady has not offered evidence to support her contentions.

72. After this action was initiated, Waters Edge was sold, and Brady received $80,000 in consideration for her one-third share. (Brady Dep. vol. 2, 354:1–7.) Although Brady contends that the Individual Defendants decided to sell Waters Edge without informing her, (Pl.'s Suppl. Interrog. Resp. ¶ 19,) she admits that she

authorized the sale, (Pl.'s Suppl. Interrog. Resp. ¶ 21.) Based on that sale and Brady's admission that she no longer has any claims against Waters Edge, (Brady Dep. vol. 2, 254:25–255:2,) Defendants are entitled to summary judgment in their favor and against Brady on her claim for judicial dissolution of Waters Edge.

73. Brady has alleged that United Realty is being mismanaged because she believes that the rent it is charging United Tool is too low and "there is a significant amount of land that is not being utilized." (Pl.'s Suppl. Interrog. Resp. ¶ 18.) Brady argues that the Individual Defendants were wrong to reject her ideas on how to better utilize the land "in order to generate a stream of income for all the parties." (Pl.'s Suppl. Interrog. Resp. ¶ 18.) United Realty currently rents the building and land to United Tool. (Brady Dep. vol. 2, 183:18–21.) Brady, as a one-third owner, receives monthly distribution checks from United Realty. (Pl.'s Suppl. Interrog. Resp. ¶¶ 24, 33; Brady Dep. vol. 1, 44:1–2.)

74. A claim for judicial dissolution is not intended to police disagreements among members that are not accompanied by proof of substantial mismanagement or financial loss. While Brady and the Individual Defendants apparently disagree about business decisions concerning the use of United Realty's land, those disagreements are not sufficient to warrant judicial dissolution.

75. Defendants are entitled to summary judgment in their favor and against Brady on her claim to dissolve United Realty.

**C.** **Brady's Claims for Access to Information and Records against United Tool and Waters Edge Are Dismissed.**

76. Brady brought a claim against United Tool pursuant to N.C. Gen. Stat. § 55-16-05 and against the Defendant LLCs pursuant to N.C. Gen. Stat. § 57C-3-04 for an inspection of corporate records. The Court dismissed Brady's inspection claims against United Realty and Enterprise based on Brady's admission that she has been provided or allowed access to all documents requested. *Brady*, 2016 NCBC LEXIS 56, at *11; *Brady*, 2015 NCBC LEXIS 59, at *7. That same admission mandates that the inspection claims against United Tool and Waters Edge be dismissed.

**D.** **Brady's Claims, if any, against the Individual Defendants Are Dismissed.**

77. Brady joined the Individual Defendants but did not specifically allege claims against them. It appears that Brady joined the other shareholders on the assumption that they were necessary parties to a claim for judicial dissolution. However, N.C. Gen. Stat. § 55-14-31(b) provides that "[i]t is not necessary to make shareholders parties to a proceeding to dissolve a corporation unless relief is sought against them individually." N.C. Gen. Stat. § 55-14-31(b). She has neither alleged nor offered proof that would lead to a finding of individual wrongdoing by any of the Individual Defendants. Accordingly, those claims, if any, should be dismissed.

78. Any pending request for attorneys' fees incurred in litigating discovery disputes are denied.

## VII.  CONCLUSION

79. For the foregoing reasons,

1) Plaintiff's Motion for Summary Judgment is DENIED;

2) Defendants' Motion for Summary Judgment is GRANTED; and

3) Plaintiffs' Second Amended Complaint is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED, this the 19th day of July, 2017.


/s/ James L. Gale
James L. Gale
Chief Business Court Judge